Dr. Reddy's Laboratories, Ltd 1821-28, Mr. O'Quinn. Obviously, at least one of the issues is the same. The cases overlap, but you're entitled to your day in court. So, whatever. We'll hear whatever you have to say. I appreciate that, Judge Lurie. May it please the court. I've listened to the court's questions on tangentiality, and I understand there is some skepticism with respect to the position that we in Hosper have advanced. Let me offer a couple of brief additional thoughts in response to some of the questions from the court, and then I'll turn to the other two grounds for which we've asserted that the doctrinal equivalence should not apply here. First, with respect to your question, Judge Toronto, sorry, three for three, I don't know where tangentiality comes from either, other than it essentially being the Supreme Court preserving a beachhead. I think it's telling what this particular beachhead is all about, which is that tangentiality is not completely separate from foreseeability or the other exception that the Supreme Court identified. Ultimately, it's about whether or not one skilled in the art could be reasonably expected to have drafted a claim that would likely have encompassed, literally, that's Festo at 741. Because both Festo and Warner Jenkinson, of course, make the point that much of the doctrinal equivalence is premised on the limits of language. Here, there are no limits of language that they can point to, and I'd point you specifically in the record to Appendix 7877. Can I just ask, though, I guess at this level of generality, wouldn't focusing as completely as you do on the limits of language collapse the tangential relation exception into the foreseeability one? Well, I don't think so, Judge Toronto, and I think this is a mistake the district court made, because what one could have said sheds light on what a person of ordinary skill in the art would understand to be the rationale. I mean, Lilly's position is that you should look at this the same as if it had said pemetrexed disodium, pemetrexed salt, or pemetrexed in its remarks to the examiner. Not just in the claim language, but in its remarks and explanations to the examiner, as if it had used those terms interchangeably. It didn't. It very specifically referred to pemetrexed disodium every time, and Judge Moore, with respect to the question that you asked about, well, isn't it talking about the toxicity of pemetrexed? When it's talking about the toxicity issue, what it's talking about is actually the narrowing from the methylmalonic acid-reducing agent to vitamin B12 or pharmaceutical derivatives, because it's saying that is what's used to treat the toxicity associated with pemetrexed disodium. But when it says what arsinian doesn't disclose to overcome anticipation, it specifically says, quote, in particular, arsinian does not disclose pemetrexed disodium. And it relies on the pemetrexed disodium at every turn in its discussion of the prior art. And that makes this case like Felix, where there was a reference to other structure, and the court said, look, that means that the gasket, you can't say the gasket was tangential. Or like the Schwartz decision, where in the specification, it referred to stabilizers. And the court said, well, you've picked stabilizers. You're stuck with the stabilizers that you picked. You couldn't apply the tangential exception. Isn't the word tangential that the Supreme Court used pretty clear? In geometry, tangent is something that doesn't quite touch. And it means that it isn't the same. And something that is tangential in the Supreme Court's thinking was exemplified here. When they cut back from antifolate to pemetrexed disodium, the salt was merely tangential because it had nothing to do with the reason for cutting back. Well, respectfully, Judge Lurie, if you take that to its logical conclusion, then that means in every single case where somebody surrenders more than they need to in order to get the patent allowed, that you could say that that space between what was surrendered and what the prior art disclosed was tangential. We don't have every single case before us. We have one case where we can see what happened. And respectfully, if it were, then what Lilly would have done would have been the same thing that the same prosecuting attorney did in the 365 patent, which issued one year before the amendments that we're talking about. And that's in Appendix 79-75. And what it refers to is pemetrexed. And its Claim 3 is wherein the pemetrexed is pemetrexed disodium. This isn't a case where they're arguing that a person of ordinary skill in the art would understand pemetrexed and pemetrexed disodium to be interchangeable. Because if that were the case, you would expect to see that there was some interchanging. Now, what they have told you is that there are some reasons that they may have limited it to pemetrexed disodium. And that's the inquiry. The question is not why was this narrowed. I do have this other patent that has a claim to just pemetrexed, not pemetrexed disodium. Can you tell me a little bit about the timing of the two patents? That other patent, was it filed simultaneously with this one, filed after this one, filed during this litigation? What's the timing? The other patent, which is to pemetrexed with pemetrexed disodium as a dependent claim, was issued in 2004. And the amendments that we're talking about now are 2005. So they're very intentionally, in this patent, when at the same time that in Europe they're referring to pemetrexed and pemetrexed disodium, in their earlier patent they're referring to pemetrexed and pemetrexed disodium, but in this patent, every single time, at every single term, they refer to pemetrexed disodium. And that may be for the reasons they said in their red brief, which is that this is the specific salt form used in clinical trials, this is page 42, and already present in the dependent claims. That rationale avoids any potential 112 problems. And indeed, if you look at Appendix 2474, footnote 6, they suggest, well, maybe they couldn't have claimed something that covered pemetrexed ditromethamine because of a lack of written description. Well, that doesn't count in favor of tangentiality. But I think because this is an objective inquiry, as this Court said in festo on remand from the Supreme Court, what's the objective rationale discernible from the record? Look at Appendix 7877 in our appendix. And it's, I think, the most single-telling thing that you'll see. Apparently, yours is the only one I've been looking at. Well, I'm very glad that you've got it in front of you, Judge Moore. And if you look at that page, what you see is at the same time that they are narrowing from all antifolates to one specific pemetrexed form, pemetrexed disodium, they are narrowing methylmalonic acid-reducing agents to vitamin B12 or pharmaceutical derivatives. And they are narrowing FBP binding agents to folic acid or physiologically available salts thereof. Now, when they are doing these narrowings at the same time, and for one of them they say, or the salts thereof, but for the other they go to a very specific form, which, by the way, in the language of the patent, the patent itself refers to pemetrexed disodium as the antifolate. Now, that may be a misstatement, but that is what the patent itself says, and it refers to it as the antifolate or the antifolate drug. But when they are going from antifolate to pemetrexed disodium, and simultaneously on the exact same page of the prosecution history, they are only going to folic acid or physiologically available salts or esters thereof. Mr. O'Kane, let me ask you about your dedication argument. Yes, Your Honor. I understand your argument to be that the reference to Akimoto in the 209 patent was a dedication to the ditro-methylamine salt? Yes, I think that, Judge Laurie, what we're... Because Akimoto has no reference... It doesn't recite that particular salt. The most it cites are ammonium salts, which is an enormous category of salts. Well, Judge Laurie, respectfully, I think pharmaceutically acceptable substituted ammonium salts, there's no evidence that that's an enormous category, and indeed quite the opposite. The evidence is that that's a discrete category. Tromethylamine is only one of 10 FDA-approved cations. It's one of six pharmaceutically acceptable FDA-approved substituted ammonium salts, as you can see at Appendix 8033 and 4637. And a person of ordinary skill in the art isn't just looking at Akimoto in isolation. They're looking at Akimoto with the 209 patent in hand. The only thing that the 209 patent discloses is about pemetrexid disodium. And so with the 209 in hand, a person of ordinary skill in the art, of course, is directed to pemetrexid because it is chief among the class of pyrilopyrinidines, if I'm pronouncing that correctly, that are disclosed in Akimoto. And when you get to the pharmaceutically acceptable substituted ammonium salts, that's a very small class. And, of course, this court doesn't even require for 112 purposes that you have to disclose a particular thing in hot grubba. And, of course, Turo makes clear that 112 requirements don't even apply in this context, that it's something less than that. I'm with Judge Lurie. I'm having difficulty. The disclosure dedication rule is, to my understanding, a pretty clear doctrine, and you would like us to muddy it in really an unsuitable way, as far as I'm concerned, by saying that if Akimoto discloses just general statements but nowhere in it tromethamine either on its own or as pemetrex did tromethamine, it nonetheless constitutes a disclosure of exactly that particular compound. I can't imagine why we would mess our doctrine up that much. Well, respectfully, Judge Moore, I think a couple of things are in play here. One is I think it's quite telling that for purposes of tangentiality. This is not tangentiality. This is a disclosure dedication doctrine. It's something different, and it's very clear. The case law on it is clear. It's disclosed in a different piece of prior art already. Therefore, you can't try to claim it. This isn't disclosed in that prior art. So, Judge Moore, the question is, what is it that has to be disclosed? Does it have to be the pemetrexid ditromethamine by name, or can it be a small genus in which that is included? Of course, this court has long recognized that the disclosure of a genus can disclose a particular species, and here all of the evidence… The point of dedication is you disclose it in your patent, and you don't claim it. We first said that in Maxwell, and then in Bank, and Johnson & Johnson. Right, and if you look at… It's a specific subject matter that you disclose and don't claim. It's dedicated. And the question is, what does it mean to be specific versus generic? And this court's decision in PSC Computing sheds light on that. PSC Computing identified used molded plastic parts as disclosing the specific plastic clips that were at issue. The genus you're talking about in Akimoto is substituted ammonium, such as sodium, potassium, lithium. It extends several lines. Well, respectfully, Judge Luria, not all of those things that are being referred to there are the substituted ammonia, some of those referring back to some of the earlier categories, like the sodium, for example. And in fact, there are three specific substituted ammoniums that are disclosed in that list. I take the point that tromethamine is not one of them, but I also submit respectfully that given the undisputed testimony that a person of ordinary skill in the art would know that there are a limited number of salt forms that could be used, this is Lilly's expert at appendix 4550, that this is not some vast genus when you're talking about pharmaceutically acceptable substituted ammonium salts of Pemetrexate. We're into your rebuttal time. Would you like to save it? That would be fine. Thank you, Your Honor. Mr. Perlman. Good morning again. May it please the court. Let me just sort of hit the new points on prosecution history estoppel rather than repeating what we all just went through. The issue on which amendment is being discussed when the paragraph on page 7880 talks about the toxicity associated with Pemetrexate disodium. The only evidence in the record is that it's referring to the Arsenian reference, which talks about the anti-folate issue. And there's nothing in support of what Mr. O'Quinn said in the record. But more importantly, it kind of doesn't matter. The context of the invention and the context of the amendment focuses on the toxicity of Pemetrexate disodium, which the skilled artisan would have recognized came from the Pemetrexate. So I think it's sort of not that important. But what, if anything, is there to the point that in these other contemporaneous patents, you were claiming Pemetrexate, a tongue tied by these words, Pemetrexate. OK, I'm just going to say P, this P compound thing. You were claiming it explicitly and not as a disodium. And I think that if we were arguing foreseeability, that would have some relevance, perhaps, because we're not claiming that we lack the ability to say different words. But that's not the question under tangentiality. And tangentiality is focused on this file history and this file history alone, as read through the eyes of the skilled person. And if you start importing things from outside the file history that the challenger would like to import, then you have to start importing things from outside the file history that the patent owner would like to import. And that's not how we do it. On the 365 patent, undoubtedly, different language was used. But the question is, what was the rationale that caused the claims in this patent application to be narrowed? And we've already discussed it, and I won't go through it. On this issue with, I feel like I'm getting a little whipsawed on this 112 issue. On the one hand, we hear, they could have claimed Pemetrexate and it solves. They could have claimed Pemetrexate. They could have claimed this. They could have claimed that. Hold it against them that they didn't. And then a few minutes later, I hear, there was a 112 issue. They had to only claim Pemetrexate, Dysote. In point of fact, there's nothing in this file history about any concern about 112 motivating anything. And that's not true of every file history. In some of the cases cited, there is a 112 issue. And if you look through the rest of the file history, the examiner doesn't discuss any 112 issue relative to this term. So I think it doesn't go anywhere. The other thing is, by the way, we had a dependent claim to Olympta at the time that we amended the broader claim. So if there was some concern about breadth of one claim, we already had the narrow claim. Nothing from this file history makes any objective sense as relating to 112, and it makes perfect objective sense relating to the act of antifoley. On disclosure dedication, there is not a single case from this court doing anything like what Mr. O'Quinn is asking you to do. Usually in disclosure dedication, the language at issue is in the patent. That's the mind run of the cases. Sometimes you had one case where it was incorporated by reference explicitly into the patent. And because of the law saying incorporation by reference makes it as if it's part of the specification, this court went that far. There's another case where the language was in the priority document and conspicuously removed from the specification. But there's no case that says, well, if you sort of refer in the spec by number to this other document, we read everything in, even if you did. But there's more than that. Sure, it says examples of alternative antifolates are in this list of... Correct, preferred examples. You could say sure, but you keep understating it. And then when we point out to you the correct words, you say sure. I don't think I'm doing that, Your Honor. My point is... Well, that's my interpretation. Go ahead. Well, yours is the more important one. My point is that the reference to Akimoto says that within Akimoto are examples of other preferred antifolates. That is a generic reference. Is it also your point that there was no incorporation by reference which must be expressed? That is correct. That is also one of our points. Can I ask you to go back to something you said, I think, in response to a question about the 365 patent? I think just tell me what about the following is wrong, and it may be on the premise. The 365 patent came out of the application 297821. Is that right? The 365 patent is in a different family than this family. I'm sorry. I don't have the 365 patent, but your joint appendix at 6370 lists 6370 as the prosecution history of the... Oh, that's the 065 patent. Yes. I'm sorry. Do we have the 365 patent? We do. The 365 patent is in the appendix at 7975, and it is an entirely different specification. I see. Okay. It's not in the family. It's not in this family. Okay. Never mind. Okay. Back to Akimoto just for one second. There's no disclosure of pemetrexid. There's no disclosure of pemetrexid. There's no disclosure of tromethamine. There's no disclosure of pemetrexid ditromethamine. And Akimoto refers, if you look at column 14, line 41 of Akimoto, it talks about the entire laundry list of salts as pharmaceutically acceptable. It says exemplified by the salts of pharmaceutically acceptable bases or acids and quaternary salts, and it gives the entire rest of the paragraph as pharmaceutically acceptable salts. So as I understand your argument, it wasn't expressly incorporated by reference, but even if it had been, it then doesn't go on to disclose the particular salt. That is correct. And I'll just, as long as I'm here, I'll make one final point. The definition of antifolate in column four, which focuses on the compound that interacts with the relevant enzymes, tells the person of ordinary skill that when it's talking about alternate antifolates, it's talking about different active antifolates, not different salt forms of the same active antifolate. And so, and that is an independent reason why disclosure dedication does not apply. And if there are no further questions, I will sit down. Thank you, Mr. Perlman. Mr. O'Quinn. So on the last point my colleague mentioned, I just say if you look at column four, line 43, it specifically refers to pemetrexidisodium as the antifolate. And what's significant here is in every single one of this court's cases where it has found that the tangentiality exception cannot apply, it's done so because there's been reference to the disputed term in the remarks to the examiner as part of the explanation, even when it wasn't necessary. And indeed, I mean, this court's decision in integrated technologies said the representations conveyed to the public that the patentee was relying, in that case, on physical contact. In this case, the words they said, pemetrexidisodium, to overcome the prior art. The public's entitled to rely on those representations. And whether patentee's interpretation of the prosecution history is plausible is irrelevant. And so too here. When you look at Felix at page 1184, at Honeywell at page 1316, at Schwartz at page 1378, each one of those cases specifically notes that the term that's being, the term that's being disputed, the term over which tangentiality is asserted, was specifically relied on. Not just in the claims, but in the remarks, in the explanation, and the court in every single one of those cases has said, you can't therefore say that it's tangential. The skilled artisan, of course, has, in looking at the specification, and in looking at the prosecution history, has the 365 patent in hand. Has Lilly's 365 patent in hand, and knows, again, it's the same prosecuting attorney. And the fundamental question that we keep coming back to, and Lilly keeps saying, it's, what was the rationale for the narrowing amendment? Okay, but what was the rationale for including the word disodium? You haven't heard one today. They've just said, it wasn't necessary. We didn't need it. Everybody knows that all that matters is pemetrexid. Well, if all that matters is pemetrexid, you would have thought that they might have said pemetrexid by itself once in this patent, like they did their prior patent. But they didn't. They every time said, pemetrexid, disodium, and there's been no explanation for as to why. And under this court's decision in Viagro, that means that they cannot prevail on that exception. Thank you, counsel. Thank you, Judge LaRocque. Case is submitted. All rise.